IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2007

## STATE OF TENNESSEE v. KELLOM TIMBS

**Appeal from the Circuit Court for Franklin County**
**No. 15345     J. Curtis Smith, Judge**

---

**No. M2006-01908-CCA-R3-CD - Filed July 18, 2007**

---

The defendant, Kellom Timbs, appeals as of right his conviction for reckless aggravated assault causing serious bodily injury, a Class D felony, imposed as a result of his jury trial in Franklin County Circuit Court.  He received a sentence of two years as a Range I, standard offender to be served on probation upon the completion of eleven months and twenty-nine days in jail.   He argues that there is insufficient proof to support his conviction, that the trial court erred in denying judicial diversion and that the trial court erred in not granting him full probation.  Upon a full consideration of the record, we affirm the judgment of the trial court as modified.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed as Modified**

D. KELLY THOMAS, JR. J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for appellant, Kellom Timbs.

Robert E. Cooper, Jr., Attorney General & Reporter; Preston Shipp, Assistant Attorney General; James Michael Taylor, District Attorney General; and William Copeland, Assistant District Attorney General, for appellee, State of Tennessee.

### OPINION

The defendant was initially indicted for aggravated assault causing serious bodily injury, a Class C felony, after he was involved in an altercation at a rock quarry with the victim, Tyler Morrison.  The record reveals that on June 8, 2003, the defendant and some friends were "mudding" and swimming at the Cowan Rock Quarry in Franklin County, Tennessee.  The victim was also there with some of his friends.  The victim testified that his first contact with the defendant came when everyone was swimming.  At that time, everyone seemed friendly and there were no problems between either group of friends.  The victim recalled that the defendant offered to help them if they got their truck stuck while mudding.  When the victim and his friends became stuck later that

afternoon, the defendant and his friends came to their assistance and attempted to pull the truck out of the mud. However, in doing so, one friend's truck was damaged. Soon thereafter, another friend pulled the truck out. The victim offered the defendant and his friend, Chris Colston, a ride back to another vehicle. He also offered to write a check for the repairs.

On their way back to another vehicle, the victim asked Colston not to smoke in his truck. An exchange took place that eventually culminated with Colston "backhanding" the victim across the face, leading to both individuals getting out of the vehicle. The victim, who was much smaller than both the defendant and Colston, removed an old bat from his truck to protect himself. At this point, the defendant stepped between the two men and, as described by the victim, the defendant "from the side took a crow hop to me and just totally rang my bells" by hitting the victim on the side of the head with his fist. The victim recalled that he hit the ground hard and that the defendant attempted to take the bat away from him as he lay on the ground. The defendant pulled the victim from the ground and head-butted him twice and then punched him in the head again. At this point, the victim released the bat as he fell to the ground a second time. Now armed with the bat, the defendant broke the bat over the victim's head while the victim was still kneeling on the ground. The victim crawled to his truck, and one of his friends drove him to the hospital. As they left the scene, the defendant and his friends continued to beat on the victim's truck and throw things.

On the way to the emergency room, the victim was bleeding profusely and began to vomit. He was unable to walk on arrival. Soon after being admitted, the victim slipped into a coma for approximately one and half days. The victim identified photographs depicting bruises to his wrists, arms, back and shoulders. His eyes were swollen shut as a result of the beating. The victim had to be airlifted to Vanderbilt Hospital for emergency surgery to treat an epidural hematoma to the right side of his brain. He suffered a severe skull fracture from the assault with the bat that required the placement of three titanium plates in his head and over one hundred staples to close the wounds. The victim suffered permanent impairment of his cognitive functioning and motor skills as a result of the injuries inflicted by the defendant.

On cross-examination, the victim denied ever swinging the bat. The victim also denied defense counsel's characterization of the defendant's actions as "trying to avoid a fight between [the victim] and Colston." The victim reiterated that he was trying to calm Colston down when the defendant intervened by hitting him in the head. He stated that he had the bat in the vehicle because he is smaller than most other men and he is not a fighter. He wanted the bat only for protection and not for any aggressive action on his own part.

Sarah Tucker, a friend of the victim, testified regarding the events of June 8, 2003. She stated that the victim never hit either the defendant or Colston. She said that the defendant hit the victim with his fist and with the bat. The defendant struck the victim in the legs and torso, but mostly in the head. She recalled that the defendant and his friends chased their truck and beat on it until they reached the stop sign leaving the quarry. Andrea Simmons, another friend of the victim, corroborated the victim's account of the incident in all respects except to add that the defendant and Colston grabbed the victim from his truck.

Dana Ables, another friend present in the vehicle, testified that Colston attempted to light a cigarette on their way back to the quarry when the victim asked him not to smoke because he had asthma. Ables stated that Colston persisted in lighting the cigarette, and when she took it from him, he told the victim not to let her talk to him that way. The victim gave Colston the cigarette and Colston proceeded to blow smoke in the victim's face. She reiterated that the victim never acted aggressively toward anyone and similarly described the assault inflicted by the defendant.

Dr. Theresa Morrison, the victim's mother and a medical doctor, testified that she called the victim's cellular phone when he had not arrived home on time. When a male voice answered the phone, she assumed it was the victim and asked where he was. The voice answered ,"[H]e can't talk on the f[***]ing phone, he's laying there bleeding where I beat his f[***]ing head in." She immediately hung up the phone and called 911. She arrived at the emergency room before the victim. She took one look at his face and knew that the emergency room doctor needed to order a CAT scan. She observed the CAT scan being run and stated that the victim had suffered a skull fracture with some bleeding in his brain. She knew that he needed a neurosurgeon so he was flown by Life Flight to Vanderbilt University Hospital. By their arrival at Vanderbilt, an additional CAT scan revealed that a blood clot on the victim's brain had grown over thirty percent, so the victim went straight to surgery. Dr. Morrison stated that the victim had suffered permanent effects from the assault in the form of short term memory loss and some loss of coordination. She also recalled that the victim weighed only one hundred and twelve pounds when he was assaulted.

Dr. Richard Norscov, the admitting emergency room physician at Lincoln Medical Center in Fayetteville, testified that the victim had to be helped into the emergency room and that, although he could answer questions appropriately, "seemed a little bit dazed at the time." The victim was vomiting which indicated a head injury so a CAT scan was performed that revealed an epidural hematoma and another small clot at the dura of the brain. He described the epidural hematoma as life-threatening.

Joshua Green testified for the defense that he pulled the victim's truck out of the mud after the brake line broke on another friend's car with their first attempt to rescue the victim's truck from the mud. He waited at the quarry for the defendant and Colston to return when a younger boy on a bicycle reported the fight. Green never witnessed any of the fight and denied that the defendant or any of their friends chased the victim's truck as it left the quarry. He recalled later that evening that Colston answered a cellular phone and sounded like he was getting into a dispute with someone when the defendant grabbed the phone from Colston and threw it in the quarry.

Andrew Smith testified for the defense that he was riding his bicycle with Glen Mitchell at the quarry on June 8, 2003. He recalled seeing the defendant and his friends leave to help pull someone out of the mud. He observed the altercation between the victim and Colston and recalled that the victim had a wooden rod in his hand. Smith opined that the victim was wanting to fight Colston when the defendant stepped between them. He recalled that the victim swung the wooden rod toward the defendant. At that point, the victim and the defendant struggled over the rod and the defendant hit the victim repeatedly during the course of the struggle. Smith claimed that the victim

said something derogatory to the defendant as the defendant was walking away with the rod, causing the defendant to turn back and strike the victim on the head, which broke the rod. Smith tried to explain that the defendant was trying to protect Colston, but, when confronted by the fact of Colston's large stature in comparison to the one hundred and twelve pound victim, Smith conceded that the defendant just wanted to get involved in the fight.

The defendant testified that he was twenty-one years old at the time of trial. He stated that he was a full-time student and worked part-time pouring concrete. He stated that he and his friends had helped pull the victim's truck from the mud and, at that time, there was no animosity between anyone. He denied starting a fight with the victim but claimed that he was trying to protect the victim from Colston. He testified that the victim persisted in struggling over the stick because he wanted to get at Colston so he hit the victim several times in an attempt to disarm him. He also apologized to the victim and his family. On cross-examination, the defendant acknowledged that a fight between the victim and Colston had not yet begun when he interceded. However, he stated that if Colston and the victim had started to fight that "Colston would have more than likely killed the boy." The defendant further testified that he weighed approximately one hundred and fifty pounds at the time of the assault and is six feet two inches tall.

Based upon this evidence, the jury convicted the defendant of the lesser offense of reckless aggravated assault. At the sentencing hearing, the trial court heard further testimony from Dr. Morrison, the victim's mother, and the defendant. The trial court denied the defendant's request for judicial diversion. In arriving at the sentence, the court found no enhancement or mitigating factors applicable and sentenced the defendant to two years as a Range I, standard offender to be served on probation after the completion of eleven months and twenty-nine days service in the local jail.

## ANALYSIS

### *Sufficiency of the Evidence*

In his first allegation of error, the defendant argues that the evidence is insufficient to support his conviction for reckless aggravated assault, basically contending that the defendant acted in self-defense or the defense of others. The state contends that the evidence is legally sufficient to support a conviction for reckless aggravated assault.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict

removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A person commits aggravated assault who "[r]ecklessly commits an assault as defined in § 39-13-101(a)(1), and . . . [c]auses serious bodily injury to another[.]" Tenn. Code Ann. 39-13-102(a)(2)(A). A person commits assault who "[i]ntentionally, knowingly or recklessly causes bodily injury to another[.]" Tenn. Code Ann. § 39-13-101(a)(1). "'Serious bodily injury' means bodily injury which involves: a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34).

We conclude that there is overwhelming evidence to support the defendant's conviction of reckless aggravated assault. The defendant in this case repeatedly beat the victim, a young man of much smaller stature than the defendant, weighing only one hundred and twelve pounds. He struck the victim in the head with his fist and his own head and, upon bringing the victim to his knees, broke a wooden bat over the victim's head. There is no question that the victim suffered serious bodily injury as a result of the defendant's actions. After slipping into a coma at the emergency room, he had to be airlifted to Vanderbilt Hospital for emergency surgery to treat the injuries to his brain. Dr. Norscov characterized the victim's injuries as life-threatening, and the victim's mother testified that the defendant suffered permanent short-term memory loss and a loss of coordination. As to the defendant's claim of self-defense, it was the jury's prerogative to reject that defense. Therefore, we conclude that the defendant's issue regarding sufficiency of the evidence to support his conviction for reckless aggravated assault is without merit.

*Denial of Judicial Diversion*

Next, the defendant contends that the trial court erred in denying judicial diversion. The state argues that the trial court appropriately exercised its discretion in denying diversion based upon the "atrocious circumstances of the offense" committed by the defendant.

Pursuant to Tenn. Code Ann. section 40-35-313(a)(1)(B), a defendant is eligible for judicial diversion when convicted of a Class C, D or E felony and has not been previously convicted of a felony or a Class A misdemeanor. The decision to grant judicial diversion lies within the discretion of the trial court and will not be disturbed on appeal unless it is shown that the trial court abused its discretion. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A denial of judicial diversion will not be overturned if the record contains any substantial evidence to support the trial court's action. Id.

When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's mental and physical health and (6) the deterrent effect of the sentencing decision to both the defendant and other

similarly situated defendants.  State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997).  The decision should be based on whether the grant of diversion will serve the ends of justice for both the public and the defendant.  Id.  The record must reflect that the trial court considered and weighed all these factors in arriving at its decision.  State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

In denying diversion, the trial court stated that none of the factors considered in making a judicial diversion determination weighed in favor or against the grant of diversion "except the circumstances of the offense, which weighs heavily against granting judicial diversion." Specifically, the court found that the defendant intervened into the argument "for no just cause."  The trial court further found that the defendant was "physically superior to the victim and cannot be excused on the basis of provocation, lack of judgment, [or] any excuse or justification for his actions."  We agree and conclude that the trial court did not abuse its discretion in denying judicial diversion.

*Denial of Alternative Sentencing*

As a final allegation of error, the defendant argues that the trial court erred in denying him full probation.  The trial court denied full probation based upon the circumstances of the offense and a finding that full probation would "depreciate the seriousness of the offense."  The state contends that the trial court appropriately denied full probation based upon "the horrible circumstances of the offense."

A defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary."  Tenn. Code Ann. § 40-35-102(6); see also State v. Fields, 40 S.W.3d 435, 440 (Tenn.2001).  The following considerations provide guidance regarding what constitutes "evidence to the contrary" that would rebut the presumption of alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1); see also State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000). Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. See Tenn. Code Ann. § 40-35-103(2), (4).  The court

should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. See id. at (5).

Because the defendant was convicted of a Class D felony, he is entitled to the presumption that he is a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6). We note, however, that "the determination of whether the appellant is entitled to an alternative sentence and whether the appellant is entitled to full probation are different inquiries." State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Where a defendant is entitled to the statutory presumption of alternative sentencing, the state has the burden of overcoming the presumption with evidence to the contrary. State v. Bingham, 910 S.W.2d 448, 455 (Tenn. Crim. App.1995), overruled on other grounds by Hooper, 29 S.W.3d at 9. Conversely, the defendant has the burden of establishing his or her suitability for full probation, even if the defendant is entitled to the statutory presumption of alternative sentencing. Id.; see Boggs, 932 S.W.2d at 477. No criminal defendant is automatically entitled to probation as a matter of law. State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. See State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-103. If the court determines that a period of probation is appropriate, it shall sentence the defendant to a specific sentence but then suspend that sentence and place the defendant on supervised or unsupervised probation either immediately or after the service of a period of confinement. See Tenn. Code Ann. §§ 40-35-303(c),-306(a).

Dr. Morrison testified at the sentencing hearing regarding the injuries suffered by the victim as well as the long-term effects of those injuries. She recounted that the victim stopped breathing during his CAT scan and had to be intubated for his flight to Vanderbilt. She also recalled that the victim was in a coma and was "unresponsive for quite some time." During his recuperation, the victim had to learn to walk again and had deal with considerable balance issues. During his senior year of high school, teachers asked to place him in special education due to difficulties with reading. The victim cannot drive due to the threat of seizures. He was not allowed to wrestle his senior year. Although he had been awarded an ROTC scholarship to Tennessee Tech, his neurosurgeon told the victim that he would never be able to attend college. At the time of sentencing, the victim was working on an assembly line in a Fayetteville factory.

The defendant testified that, at the time of sentencing, he was a full-time student at Motlow State Community College with plans to transfer to Shelbyville Tech or Tennessee Tech to complete computer programming certification classes.

In arriving at the sentence, the trial court determined that full probation would depreciate the seriousness of the offense committed by the defendant and imposed a sentence of two years to be served on probation after the completion of eleven months and twenty-nine days in jail. To deny probation or another alternative sentence based on the seriousness of the offense, "the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring an alternative sentence. State v. Hartley, 818 S.W.2d 370, 375 (Tenn. Crim. App.1991); see also State v. Blackhurst, 70 S.W.3d 88, 98 (Tenn. Crim. App.2001). We conclude that the record fully supports the denial of full probation in this case. The defendant's conduct in this case came dangerously close to resulting in a homicide and left the victim with long-term and permanent effects. The brutal beating suffered by the victim has profoundly changed the course of this young victim's life. The facts of this offense are so violent and offensive that they outweigh any factors in favor of full probation, such as the defendant's lack of criminal record. The defendant has not established his suitability for full probation. Therefore, we conclude that the trial court's denial of full probation was correct.

Although not raised by either party, we conclude that the judgment in this case must be modified due to the trial court's imposition of an eleven month and twenty-nine day term of confinement prior to probation. This court has previously held that a sentence of confinement pursuant to Tennessee Code Annotated section 40-35-306(a)(3) may not exceed the release eligibility date of an offender as defined by Tennessee Code Annotated section 40-35-501(a)(3). State v. John W. Hill, No. 01C01-9802-CC-00072, 1999 WL 92948, slip op. at *1 (Tenn. Crim. App. Feb. 25, 1999). Because the defendant was sentenced to two years as a Range I, standard offender, his release eligibility date would occur after the service of thirty percent of his sentence, less any sentencing credits. Tenn. Code Ann. § 40-35-501(c). Therefore, we modify the judgment to require the service of two hundred and nineteen days in jail, less any applicable sentencing credits, with the remainder of the sentence to be served on probation.

CONCLUSION

We conclude that there is sufficient evidence to support the defendant's conviction for reckless aggravated assault. Furthermore, the trial court's denial of judicial diversion and imposition of a two year sentence of split confinement was appropriate, except that the term of confinement in the local jail shall be modified to two hundred and nineteen days. Therefore, the judgment of the trial court is affirmed as modified.

_____
D. KELLY THOMAS, JR., JUDGE